UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

DAIKEL DUMONT RODRIGUEZ,

      Petitioner,

    v.

WARDEN OF ALLIGATOR
ALCATRAZ,

      Respondent.

_____/

Case No. 2:26-cv-268-KCD-NPM

## **ORDER**

Petitioner Daikel Dumont Rodriguez, a Cuban citizen, has lived in the United States for over fifteen years. For the last seven years, he has been free on an order of supervision—a kind of immigration parole where he checks in periodically but otherwise lives his life. That changed on November 23, 2025, when the Government revoked Rodriguez's supervision and took him back into custody. He has now filed a habeas corpus petition to challenge that confinement, seeking release. (Doc. 5.)[1]

He mounts a multi-pronged attack. First, he argues that the Government violated the Fifth Amendment's Due Process Clause by revoking his liberty without prior notice, an explanation, or a meaningful opportunity to be heard. Second, he invokes the *Accardi* doctrine, contending that his

---

[1] Unless otherwise indicated, all internal quotation marks, citations, case history, and alterations have been omitted in this and later citations.

detention is unlawful because ICE completely ignored its own binding regulations governing the revocation of release. Finally, he asserts that his detention violates the Immigration and Nationality Act ("INA") because the state-run facility holding him lacks the proper statutory authority and federal contracts to operate as an immigration detention center.

The Government contends that it did exactly what the law permits. (Docs. 8, 13.) By revoking Rodriguez's release to enforce a final removal order, the agency satisfied both its own regulations and the Constitution's due process demands. (*Id.*) For the reasons below, Rodriguez has failed to show that his return to custody is unlawful. His habeas petition thus fails.

## I. Legal Framework

The federal habeas statute, 28 U.S.C. § 2241, provides authority to issue writs of habeas corpus when an individual is "[i]n custody in violation of the Constitution or laws or treaties of the United States." *Id.* § 2241(c)(3). "At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest." *I.N.S. v. St. Cyr*, 533 U.S. 289, 301 (2001). "Section 2241 authorizes federal courts to hear challenges to immigration detention." *Grigorian v. Bondi*, No. 25-CV-22914-RAR, 2025 WL 2604573, at *2 (S.D. Fla. Sept. 9, 2025).

## II. Discussion

As a preliminary matter, the Government claims that 8 U.S.C. §§ 1252(g) and 1252(b)(9) divest the Court of jurisdiction to review Rodriguez's claims. (Doc. 8 at 5.) While these provisions serve to limit judicial interference with the Executive's discretionary authority to execute removal orders, they do not constitute a categorical bar to habeas corpus challenges regarding the lawfulness of physical detention. Rodriguez does not seek to set aside or delay the execution of his 2019 removal order. Instead, he challenges the legal basis for his re-detention and the adequacy of the procedures employed by ICE to revoke his supervised release. For the same reasons previously explained, "the Court [is] satisfied of its jurisdiction." *See Rodriguez v. ICE*, No. 2:26-CV-2-KCD-DNF, 2026 WL 746563, at *2 (M.D. Fla. Mar. 17, 2026). Rodriguez's substantive claims are addressed in turn below.

### A. Substantive Due Process (Count I)

The Fifth Amendment entitles noncitizens to due process during deportation proceedings. At the same time, however, "detention during deportation proceedings [is] a constitutionally valid aspect of the deportation process." *Demore v. Kim*, 538 U.S. 510, 523 (2003). "[T]he through line of history is recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Dep't of State v.*

*Munoz*, 602 U.S. 899, 911-12 (2024). "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 79-80 (1976).

Because immigration detention is a civil tool rather than a criminal penalty, the constitutional line is generally drawn at punishment. *See Rodriguez-Fernandez v. Wilkinson*, 654 F.2d 1382, 1387 (10th Cir. 1981). By contrast, the Government can lawfully hold a noncitizen to ensure they are present for removal or to keep the public safe. That is simply the machinery of the immigration system doing its job. A substantive due process violation happens only when that machinery breaks down—when the detention loses its reasonable connection to effectuating a removal order and morphs into a penalty. *Cf. Lee v. Stone*, No. 2:11-CV-00014-RWS, 2011 WL 4553147, at *7 (N.D. Ga. Aug. 25, 2011). So long as the custody serves a legitimate immigration purpose rather than acting as a punitive measure, it stays on the right side of the Constitution. *See, e.g.*, *United States v. Salerno*, 481 U.S. 739, 747 (1987); *Rodriguez v. Perry*, 747 F. Supp. 3d 911, 917 (E.D. Va. 2024) ("[A]liens . . . have a substantive due process right to be free of arbitrary confinement pending deportation proceedings.").

Rodriguez cannot show that his current stint in custody is a punishment masquerading as immigration processing or is otherwise

arbitrary. He is subject to a final removal order that stands uncontested. The INA explicitly authorizes a return to detention to effectuate such orders. Under the rules, ICE may revoke a noncitizen's release to effectuate removal. 8 C.F.R. § 241.13(i)(2). And the government no doubt has a legitimate interest in doing exactly that—enforcing its laws, ensuring individuals do not flee, and protecting the public. *See Malam v. Adducci*, 469 F. Supp. 3d 767, 790 (E.D. Mich. 2020). Here, the Government revoked Rodriguez's release specifically to enforce his outstanding removal order. Returning him to custody thus serves a recognized, legitimate government objective.

Nor are we anywhere near the constitutional danger zone. ICE re-detained Rodriguez on November 23, 2025. He has been in custody for three months. That is a far cry from the indefinite, limbo-like detention that the Supreme Court has rejected under the Fifth Amendment. *See Zadvydas v. Davis*, 533 U.S. 678 (2001). Instead, it falls well within the six-month window the *Zadvydas* Court deemed presumptively reasonable to carry out a deportation. *Id.* at 701 (holding that executive agencies may not hold noncitizens longer than six months when removal is not foreseeable and stating, "[a]fter this 6-month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing").

5

Rodriguez claims that his removal is not likely in the foreseeable future. (Doc. 5 ¶ 77.) This argument fails. Until the six-month *Zadvydas* period concludes, detention is presumptively reasonable, and any substantive due process claim is not ripe. *See, e.g., Grigorian v. Bondi*, Case No. 25-CV-22914-RAR, 2025 WL 1895479, at *8 (S.D. Fla. July 8, 2025); *Lopez v. Dir. of Enf't and Removal Operations*, Case No. 3:25-cv-1313-JEP-SJH, 2026 WL 261938, at *12 (M.D. Fla. Jan. 26, 2026); *Guerra-Castro v. Parra*, Case No. 25-cv-22487-GAYLES, 2025 WL 1984300 at *4 (S.D. Fla. July 17, 2025) (finding habeas petition "premature" because "Petitioner has not been detained for more than six months").

## B. Procedural Due Process (Count II)

For starters, it's not entirely clear that Rodriguez is entitled to a freestanding due process analysis at this time. When the Supreme Court confronted the constitutional perils of indefinite immigration detention in *Zadvydas*, it did not instruct lower courts to start weighing the process afforded to the detainee. It set a timer. For the first six months, detention is presumptively reasonable. *Zadvydas*, 533 U.S. at 701. So until that timer goes off, *Zadvydas* itself seemingly supplies the constitutional metric. *Martinez v. Larose*, 968 F.3d 555, 566 (6th Cir. 2020). "In other words, the *Zadvydas* standard *is* due process: a § 1231 detainee who fails the *Zadvydas* test fails to prove a due process violation." *Castaneda v. Perry*, 95 F.4th 750,

6

760 (4th Cir. 2024). Because Rodriguez's detention is barely out of the starting gate, he is presumably not yet entitled to anything more.

But even if we assume the due process clause applies with full force, Rodriguez still comes up empty. His claims boil down to a familiar grievance: the Government ignored its own regulations. (Doc. 5 ¶ 80.) He alleges that ICE locked him back up without providing the required notice or an interview after his return to custody. (*Id*.) He also claims that his revocation is void because the official who signed the paperwork lacked the authority to do so. (*Id*. ¶ 83.) By ignoring the agency's rulebook, the logic goes, the Government short-circuited his constitutional rights. (*Id*.)

At its core, the Due Process Clause demands that before the government strips a person of a protected liberty interest, it must provide notice and a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). "Due process requires notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010).

In the context of revoking a noncitizen's supervised release, ICE's regulations strike that constitutional balance by guaranteeing written notice and an informal interview that allows the individual to respond. *See* 8 C.F.R. §§ 241.4(l)(1), 241.13(i). To be sure, Rodriguez quibbles with the exact form

7

and content of that notice—and the Court will take up those specific regulatory grievances below. But strip away the administrative labels, and the constitutional picture is clear. For purposes of the Fifth Amendment, the process he received clears the bar. Due process is not a rigid straitjacket. It requires only that the Government provide fair notice and a meaningful opportunity to be heard. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). By handing Rodriguez a written notice that identified the agency's decision and sitting him down for an interview to present rebuttal evidence (Doc. 8 at 2), ICE gave him exactly that. Rodriguez thus received what the Fifth Amendment requires—fair notice and a meaningful opportunity to be heard.

### C. Accardi Doctrine (Count III)

Rodriguez does not rely on the Constitution alone. He also brings a claim under the *Accardi* doctrine. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260 (1954). The premise of that doctrine is straightforward: "an agency must abide by its own regulations." *Chevron Oil Co. v. Andrus*, 588 F.2d 1383, 1386 (5th Cir. 1979). "[A]gency deviation from its own regulations and procedures may justify judicial relief in a case otherwise properly before the court." *Jean v. Nelson*, 727 F.2d 957, 976 (11th Cir. 1984). And it "goes without saying that ICE, like all government agencies, must follow its own regulations." *Roble v. Bondi*, 803 F. Supp. 3d 766, 774 (D. Minn. 2025).

Because it appears the Government previously released Rodriguez after determining that there was no significant likelihood of his removal (Doc. 5-5), the regulation governing his return to custody here is 8 C.F.R. § 241.13(i). *See Choy v. Woosley*, No. 4:25-CV-197-DJH, 2026 WL 324601, at *3 (W.D. Ky. Feb. 6, 2026). It provides the precise steps ICE must take before re-arresting someone based on a renewed likelihood of removal. *Id.* § 241.13(i).

Rodriguez argues that ICE ignored those mandatory procedures entirely. He allegedly received "no written explanation, no finding of violation, and no procedural steps whatsoever before cancelling his supervision and taking him into custody." (Doc. 5 ¶ 87.). Under *Accardi*, he concludes, that complete regulatory bypass renders his ongoing detention legally defective and unlawful.

Rodriguez's contention that he received no written notice is a nonstarter. When officers took him into custody, he was provided a "Notice of Revocation of Release." (Doc. 8-3.) And this piece of paper told him exactly why he was losing his liberty: there is a significant likelihood of removal in the reasonably foreseeable future. (*Id.*) That is a written explanation. It may not have been the extensive memorandum Rodriguez would have preferred, but it was more than enough to put him on notice of the Government's basic rationale for bringing him back into custody. Nothing more was needed to

satisfy § 241.13(i). *See Tran v. Warden, S. Side Det. Ctr.*, No. 2:25-CV-1224-KCD-NPM, 2026 WL 672969, at *8-9 (M.D. Fla. Mar. 10, 2026).

Turning next to Rodriguez's claim that the notice had "no finding of [a] violation," that argument misses the mark for a different reason. (Doc. 5 ¶ 87.) He seemingly insists that ICE could not revoke his supervision because he never broke the rules. But the applicable regulation simply does not require a rulebook infraction to haul someone back into custody. Under 8 C.F.R. § 241.13(i)(2), the government can revoke release based on changed circumstances alone—specifically, when there is a "significant likelihood that the alien may be removed in the reasonably foreseeable future." *Id.* Playing by the rules is commendable, but it does not buy a noncitizen permanent immunity from a final, executable deportation order.

Rodriguez similarly complains that the Government took "no procedural steps whatsoever before cancelling his supervision and taking him into custody." (Doc. 5 ¶ 87.) If he means ICE was required to provide process *before* putting him in handcuffs, he is misreading the text. Section 241.13(i) does not mandate a pre-deprivation process. It allows the agency to revoke a release order and detain an individual based on changed circumstances without first convening a panel or holding a hearing. *See* 8 C.F.R. § 241.13(i)(3) ("The Service will conduct an initial informal interview promptly *after* his or her return to Service custody to afford the alien an opportunity to

respond to the reasons for revocation stated in the notification." (emphasis added).)

Rodriguez lastly complains that the Government failed to provide "a duly executed notice signed by the proper official." (Doc. 5 ¶ 83.) He insists this technicality voids the entire revocation. *See* 8 C.F.R. § 241.4(l)(2); *cf. Ceesay v. Kurzdorfer*, 781 F. Supp. 3d 137, 160 (W.D.N.Y. 2025) ("[U]nder § 241.4(l)(2), the officials with the power to revoke release after making certain findings include field office directors and any other officials delegated the function or authority ... for a particular geographic district, region, or area.").

But there is a fundamental problem with this point: Rodriguez is reading the wrong regulation. Section 241.13 contains no rigid signature requirement limiting revocation authority to field office directors or other specific high-ranking officials. It simply says the agency can revoke an order of supervision if changed circumstances mean removal is now significantly likely. Rodriguez never identifies how the Government failed to comply with the regulations or who should have signed the revocation notice. *See Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) ("It is the petitioner's burden to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation."). So on this point, Rodriguez has shown no error.

11

Section 241.13 requires a specific procedural safeguard once a noncitizen is returned to custody: an "informal interview." 8 C.F.R. § 241.13(i)(3). That interview is designed to give the individual a meaningful chance to respond to the agency's reasons for revoking his conditional liberty. *See Kem v. Noem*, No. 3:25CV997 DRL-SJF, 2026 WL 100566, at \*4 (N.D. Ind. Jan. 14, 2026). And as already established, the Government provided such an interview. For the reasons above, Rodriguez has shown no *Accardi* violation.

### D. Counts IV & V—No Authority to Detain[2]

In his final claims, Rodriguez shifts focus from the process of his detention to the place of his detention. He takes aim at the facility where he was housed—Alligator Alcatraz—arguing that it operates outside the bounds of the law. (Doc. 5 at 25-26.)

These claims can be disposed of quickly. Even if he is right, and Alligator Alcatraz is operating in clear violation of the law, that fact would not entitle him to the relief he wants—release from ICE custody. A challenge to the conditions of confinement does not suddenly invalidate the legal basis for that confinement. If a detention center is sub-par or operated unlawfully, the proper judicial remedy is to order the government to fix the facility or to

---

[2] The petition inadvertently labels both of its final two claims as "Count IV." (Doc. 5 at 25.) For clarity and ease of reference, the Court refers to the final claim regarding 8 U.S.C. § 1103(a)(11)(A) as Count V.

transfer the detainee to one that passes muster. The Court declines to use a facility defect as an excuse to simply unlock the gates and let an individual with a final, executable removal order walk free.

**\* \* \* \***

In the final pages of his petition, Rodriguez tacks on two more requests for relief that seem to come out of nowhere. First, he asks for notice and a hearing to oppose removal to an "alternative third country," just in case the Government identifies one. (Doc. 5 at 26.) Second, he asks for a sweeping injunction to stop the Government from re-arresting him in the future, absent strict compliance with federal law. (*Id.*)

Neither request gets off the ground. To begin with, they are seemingly untethered from the petition itself. A prayer for relief is not a place to smuggle in standalone demands, and neither of these requests appears tied to an actual, substantive claim argued in his briefing. For instance, Rodriguez does not allege that he was denied an opportunity to contest his removal to a third country.

More fundamentally, both requests deal in pure hypotheticals. They ask the Court to solve problems that do not actually exist. "Federal courts cannot adjudicate . . . abstract disputes, or exercise general legal oversight of the Legislative and Executive Branches." *Coker v. Austin*, 688 F. Supp. 3d 1116, 1121 (N.D. Fla. 2023). Rodriguez has not alleged that the Government

13

denied him the opportunity to contest his removal to a third country. Similarly, he is currently sitting in custody, not living freely in the community bracing for a future, legally deficient re-arrest. Because these requests ask the Court to shadowbox with hypotheticals, they warrant no relief.

### III. Conclusion

Rodriguez has not established that his current detention is unlawful. But he may return to challenge his revocation if his continued detention becomes unconstitutionally prolonged. Accordingly, the Amended Petition for Writ of Habeas Corpus (Doc. 5) is **DENIED WITHOUT PREJUDICE**. The Clerk of Court is **DIRECTED** to enter judgment, deny any pending motions as moot, and close this case.

**ORDERED** in Fort Myers, Florida on March 30, 2026.

Kyle C. Dudek
United States District Judge

14